IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| CHRISTOPHER RANDALL DAVIS, | |
| Plaintiff, | |
| v. | Case No.: 3:19-CV-00024-CAR |
| SHERIFF JOE CHAPMAN, et al., | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Christopher Davis files this brief in support of partial summary judgment as to liability for the unlawful imposition of a prior restraint on his speech against Defendant Deputy Eric Whitlow, in violation of the First Amendment of the United States Constitution. The amount of damages stemming from Plaintiff's loss of free speech rights would be determined at trial. Plaintiff does not seek summary judgment at this time for any other claim arising from his arrests or other retaliatory actions or against any other Defendants.

**STATEMENT OF UNDISPUTED FACTS[1]**

---

[1] For the purposes of this motion, the following are the key undisputed facts. Plaintiff has set forth these facts and additional facts in his Statement of Undisputed Material Facts filed contemporaneously herewith. He incorporates those facts into this briefing to the extent necessary.

1. On December 6, 2018, Deputy Whitlow was assigned to investigate a complaint from Chad Link, owner of CL Fencing. Deputy Whitlow met with Mr. Link at his residence. Exhibit C, Incident Report Link Complaint at 4.

2. Mr. Link complained to Deputy Whitlow about Plaintiff posting negative reviews and comments to the CL Fencing Facebook page. Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 1:32 - 8:30.

3. Deputy Whitlow contacted his supervisor Lt. Hess through dispatch. Deputy Whitlow informed Lt. Hess that he intended to call Plaintiff and "tell him to quit." Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 16:11. *See also* Whitlow Deposition, Doc. forthcoming, 13:14-14:13 (establishing speaker as Lt. Hess).

4. Lt Hess told Deputy Whitlow, "If you do make contact with him, you might want to allude to the fact that he has enough trouble with Walton County. Does he really want to keep putting it on himself?" Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 18:25.

5. Deputy Whitlow did not have probable cause or arguable probable cause to believe that Plaintiff had committed any crime. Whitlow Deposition, Doc. forthcoming at 20:12-13, 9:4-8.

6. Deputy Whitlow placed a call to Plaintiff through dispatch and said the following to Plaintiff during this phone conversation:

   a. "Decease from what you're doing as far as the Facebook posts go" because "when you continue to post stuff negative towards other people's comments on the same thing, you're defamating [sic] the character of this company." Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 21:23.

   b. "I'm familiar with who you are and I just don't think we need to continue on with the troubles here, especially in our county." Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 22:10.

   c. "It was a bad incident, yes, I agree with you, but that one review needs to stay up and that's it.  You don't need to continue on badgering the stuff. That's just uncalled for. That's childish." Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 22:47.

   d. "If this continues on and I get another call about this then we're going to be back to square one with you and I don't think we want that because Dacula will get a call and they'll come pick you up for me."

    Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 23:10

7. Plaintiff was forced to agree not to post any further comments upon threat of criminal prosecution. Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 22:20, 23:32. *See also* Exhibit A, Davis Declaration, ¶ 9, 10.

8. Deputy Whitlow then contacted Lt. Hess to relay the conversation. Deputy Whitlow informed Lt. Hess that he told Plaintiff that he must "stop what he's doing" and that "I shouldn't' have to remind you of the reason you're not in our county anymore, but if you continue to harass this man and his company I'll make sure Dacula comes out and deals with you accordingly or we will come handle it." Exhibit D, Whitlow Dashboard Camera Video Responding to Link Incident at 24:14.

9. Plaintiff is damaged as he seeks to post additional comments to CL Fencing's Facebook page, but has refrained from doing so because of Deputy Whitlow's threats of criminal prosecution. Exhibit A, Davis Declaration, ¶ 10,11.

## ARGUMENT AND CITATION TO AUTHORITY

Deputy Whitlow violated Plaintiff's clearly established First Amendment rights by silencing Plaintiff's protected online speech with multiple threats of arrest and is not entitled to qualified immunity for this violation.

### I. DEPUTY WHITLOW ENGAGED IN AN IMPERMISSIBLE PRIOR RESTRAINT UNDER THE FIRST AMENDMENT

"The doctrine of prior restraint, reduced to its simplest form, is that no prior restraint may prevent exercise of free speech, although criminal or civil action may result from that speech." *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 421 (W.D. Pa. 1984). "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982). Prior restraint is censorship of the worst kind -- it prevents expression from reaching the marketplace of ideas. *Southeastern Promotions v. Conrad*, 420 U.S. 557, 559 (1975) ("a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand").

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Indeed, the Supreme Court has written that "it has been generally, if not universally, considered that it is the chief purpose of [the First Amendment] to prevent previous restraints upon publication." *Near v.*

5

*Minnesota ex rel. Olson*, 283 U.S. 697, 713-14 (1931). Thus, "[a]ny prior restraint on expression comes ... with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415,419 (1971); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (prior restraint "comes to this Court bearing a heavy presumption against its constitutional validity"); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (prohibiting prior restraint of "Pentagon Papers" containing sensitive national security data despite government's claim of "grave and irreparable" damage to the national security). Prior restraint is never allowed unless a case "fit[s] within one of the narrowly defined exceptions to the prohibition against prior restraint." *Southeastern Promotions Ltd.*, 420 U.S at 559.

"Prior restraints are presumptively unconstitutional and face strict scrutiny." *Burk v. Augusta-Richmond Cty.*, 365 F.3D 1247 (11th Cir. 2004); *First National Bank of Boston v. Belloti*, 435 U.S. 765, 786 (1978) (" exacting scrutiny" applied). The Supreme Court explains:

> Ordinarily, the State's constitutionally permissible interests are adequately served by criminal penalties imposed after freedom to speak has been so grossly abused that its immunity is breached. The impact and consequences of subsequent punishment for such abuse are materially different from those of prior restraint. Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 180-81 (1968).

Plaintiff was undisputedly threatened with legal sanction by Deputy

Whitlow should he continue to share his negative consumer experience online. This is a prior restraint. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), the Supreme Court reviewed the constitutionality of the "Rhode Island Commission to Encourage Morality in Youth." *Id.* at 59. The Commission's purpose was "to educate the public concerning any book, picture, pamphlet, ballad, printed paper or other thing containing obscene, indecent or impure language, or manifestly tending to the corruption of the youth." *Id.* The Commission's practice was to notify distributors that certain material had been reviewed by the Commission and had been declared by a majority of its members to be objectionable for sale, distribution or display to youth under 18 years of age. *Id.* at 61. The typical notice provided by the Commission reminded the recipient that, in the absence of compliance, it was the Commission's duty to recommend prosecution of purveyors of obscenity to the Attorney General. *Id.* at 62.

The Supreme Court recognized that Rhode Island's informal threats of legal sanctions amounted to a prior restraint. The Court noted that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around ... " *Id.* at 68. In a footnote replete with citations of authority, the Court further noted that "Threats of prosecution on the part of chiefs of police or prosecutors, have been enjoined in a number of cases." *Id.* at 67 n. 8. In finding the informal notification system

unconstitutional, the Supreme Court noted that"[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Id.* at 70.

The Eleventh Circuit and other courts have undeniably reached the same conclusion as the Supreme Court in *Bantam Books* - that threats of legal sanction by public officials are prior restraints. In *Penthouse Int'l v. McAuliffe*, this Circuit held that that the Georgia Solicitor General's initiation of warrantless arrests and harassing visits by prosecutors forced involuntary self-censorship by magazine distributors and constituted an informal prior restraint which was unconstitutional under the First Amendment. 610 F.2d 1353 (5th Cir. 1980) (binding precedent in the Eleventh Circuit). *See also Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) ("The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands."); *Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228 (4th Cir. 1970) (Sheriff threatening arrest of persons exhibiting 'X' and 'R' rated films constituted prior restraint). *See also Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir.2003) (per curiam) (holding letter from public official to owner of billboard company criticizing billboards displaying a religious organization's signs proclaiming homosexuality to be a sin could be violative of the organization's First Amendment free speech rights, as

letter could be interpreted as containing implicit threat of government retaliation); *American Family Association, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir.2002) (finding that a public official who tries to shut down an avenue of expression of ideas and opinions through "actual or threatened imposition of government power or sanction" is violating the First Amendment).

The Supreme Court has made it clear that even indirect or implied threats of criminal prosecution constitute coercion sufficient to impose an unlawful prior restraint on speech. *Bantam Books*, 372 U.S. at 68. *See also Okwedy*, 333 F.3d at 344 ("A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form."). Courts have consistently followed the approach taken in *Bantam Books* of "look[ing] through forms to the substance," *Bantam Books*, 372 U.S. at 67, to reject contentions that officials were merely requesting voluntary compliance or dispensing legal advice rather than forcing involuntary suppression of speech. *See, e.g.*, *Penthouse Int'l*, 610 F.2d at (applying Bantam Books to find that retailers' removal of magazines from shelves was not voluntary in the face of threats of criminal sanction by prosecutor); *Council for Periodical Distributors Ass'n v. Evans*, 642 F. Supp. 552, 563 (M.D. Ala. 1986), aff'd in part, vacated in

part on other grounds sub nom. *Council for Periodical Distributors Associations v. Evans*, 827 F.2d 1483 (11th Cir. 1987) (collecting cases from numerous courts to reject district attorney's assertion that his letter to magazine retailers compelling attendance at a meeting regarding possible violation of obscenity law was meant to inform not suppress and to seek only voluntary compliance); *Backpage.com*, 807 F.3d at 231-32 (discussed below).

Here, Deputy Whitlow clearly employed the types of threats found unlawful in Bantam and its progeny. Despite admittedly having no probable cause to believe Plaintiff had committed any crime, Deputy Whitlow directly threatened to have Gwinnett County Police arrest Plaintiff if he continued to post negative reviews of CL Fencing online. He further threatened Plaintiff by alluding to Plaintiff's prior arrests and banishment from Walton County and suggesting the possibility of additional punitive action on the part of Walton County. He also made specific and repeated demands that Plaintiff refrain from future posts.

Additionally, under the prior restraint doctrine, the government cannot prohibit future expressive activity as a result of past unlawful conduct. *Universal Amusement Co. v. Vance*, 587 F.2d 159 (5th Cir. 1978), aff'd 445 U.S. 308 (1980) (holding unconstitutional a Texas statute which authorized state judges to enjoin the future exhibition of films by a business that had shown obscene films in the past); *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503,

507 (6th Cir. 2001) ("[W]here a law sets out primarily to arrest the future speech of a defendant as a result of his past conduct, it operates like a censor, and as such violates First Amendment protections against prior restraint of speech"). Obviously, that rule applies with all the greater force where the past "misconduct" has not been proven (and cannot be proven because it is devoid of even arguable probable cause) and is not even rationally related to the expressive activity.

Further, no court has suggested that internet communication is somehow not subject to prior restraint analysis. The Supreme Court has characterized social media as "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard" and "the most important place[] . . . for the exchange of views" in the modern era. *Packingham v. North Carolina*, 137 S.Ct. 1730, 1737, 1735 (2017). Several courts have analyzed prior restraints on internet communication. *See, e.g.*, *United States v. Carmichael*, 326 F.Supp. 2d 1267 (M.D. Ala. 2004) (holding that proposed protective order to take down a website operated by defendants, charged with drug conspiracy and money laundering, would impose an unlawful prior restraint despite allegations that the website, which included the names, photographs and personal information on trial participants including agents and informants, was threatening); *O'Donnell v. Knott*, 283 F. Supp. 3d 286, 305 (E.D. Pa. 2017) (operator of social media satirizing public official plausibly plead unlawful prior restraint where detectives threatened to arrest her); *Novak v. City of*

11

*Parma*, 932 F.3d 421, 433 (6th Cir. 2019) (operator of social media page mocking the city police department plausibly plead informal prior restraint where officers issued a press release threatening to take legal action); *Zieper v. Metzinger*, 392 F.Supp. 2d 516, 531 (S.D.N.Y. 2005) (finding that website video of a mock terrorist attack in Time Square was protected speech subject to prior restraint analysis). *See also Sheehan v. Gregorie*, 272 F.Supp.2d 1135 (W.D. Wash. 2003) (statute prohibiting release of police officer's personal information unconstitutional as applied to police accountability website); *Porter v. Bowen*, 496 U.S. 1009 (9th Cir. 2007) (threatened prosecution of vote- swapping website unconstitutional); *Pilchesky v. Miller*, 2006 WL 2884445 (M.D. Pa. 2006) (public officials' demands to shut down on-line message board with "wanted" postings about public officials stated First Amendment claim).

In *Backpage.com, LLC v. Dart*, the Seventh Circuit ruled that an internet company's First Amendment rights were violated when a sheriff wrote a letter urging credit card companies to stop dealing with the online provider of classified ads, saying the website was allegedly connected to sex trafficking. 807 F.3d at 239. The Court held that the sheriff's letter imposed an informal prior restraint on the internet company's speech where not all of their advertisements were for illegal sex, the sheriff sent the letter on his official stationary in his official capacity, the letter intimated that credit card companies could be prosecuted for processing

payments made by purchasers of ads that promote unlawful sexual activity, the companies perceived the letter as threats and complied with the sheriff's request within two days of receipt, and the companies' compliance was likely to cause the internet business to cease. *Id.* The Court found:

> [The sheriff] is using the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech, and by doing so he is violating the First Amendment unless there is no constitutionally protected speech in the ads on Backpage's website—and no one is claiming that. The First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands. *Id.* at 231.

In analyzing the sheriff's letter, Judge Posner found that the use of "cease and desist" language, *intimations* that the credit card companies may be criminal accomplices and/or acting in violation of federal law, and most importantly, the sheriff's indication that he would follow-up with the organizations, constituted "dire" implied threats designed to silence the company's speech:

> The letter is on stationery captioned "Office of the Sheriff," and begins: "As the Sheriff of Cook County, a father and a caring citizen, I write to request that your institution immediately cease and desist from allowing your credit cards to be used to place ads on websites like Backpage.com." Notice that he is sheriff first, father and citizen second; notice his use of the legal term "cease and desist"; notice that he calls MasterCard "your institution," implying that the same letter is going to other "institutions"—namely other credit card companies—in other words that he is organizing a boycott. And notice that he doesn't demand that "your institution" refuse to allow "your credit cards" to be used to pay just for ads on Backpage's website that promote illegal products or services—he demands that "your institution" cease and desist from placing any ads "on websites like Backpage.com" (and a fortiori on Backpage's own website) even though "adult" ads are only one

of eleven types of *232 classified ad published on the website. Visa and MasterCard got the message and cut all their ties to Backpage.

The letter goes on to state that "it has become increasingly indefensible for any corporation to continue to willfully play a central role in an industry that reaps its cash from the victimization of women and girls across the world." The implication, given whom the letter is addressed to, is that credit card companies, such as MasterCard and Visa, "willfully play a central role" in a criminal activity (emphases added)—so they had better stop! Indeed, the letter goes on to say, those companies are "key" to the "growth" of sex trafficking in the United States . . . . He is intimating that two of the world's largest credit card companies may be criminal accomplices.

"Financial institutions," the letter continues, "have the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of minors." The letter cites the federal money-laundering statute, 18 U.S.C. § 1956, thereby intimating that the credit card companies could be prosecuted for processing payments made by purchasers of the ads on Backpage that promote unlawful sexual activity, such as prostitution. And "make no mistake," the letter thunders: "Your [credit] cards have and will continue to be used to buy ads that sell children for sex on sites like Backpage.com.... The use of credit cards in this violent industry implies an undeserved credibility and sense of normalcy to such illicit transactions and only serves to increase demand."

And here's the kicker: "Within the next week, please provide me with contact information for an individual within your organization that I can work with [harass, pester] on this issue." The "I" is Sheriff Dart, not private citizen Dart—the letter was signed by "Thomas Dart, Cook County Sheriff." And the letter was not merely an expression of Sheriff Dart's opinion. It was designed to compel the credit card companies to act by inserting Dart into the discussion; he'll be chatting them up. *Id.* at 231-32.

The court also focused on communications amongst the sheriff's staff in determining whether the sheriff's letter to the credit card companies had a probable and actual coercive effect. As here, where Deputy Whitlow and his supervisor discussed issuing a "reminder" to Plaintiff of his legal "trouble" with Walton

14

County, officer's plans to threaten the credit card companies with "reminders" of their potential legal liability were "ominous":

> Further insight into the purpose and likely effect of such a letter is provided by a strategy memo written by a member of the sheriff's staff in advance of the letter. The memo suggested approaching the credit card companies (whether by phone, mail, email, or a visit in person) with threats in the form of "reminders" of "their own potential liability for allowing suspected illegal transactions to continue to take place" and their potential susceptibility to "money laundering prosecutions ... and/or hefty fines." Allusion to that "susceptibility" was the culminating and most ominous threat in the letter. *Id.* at 232.

The opinion further cited the District Court's "lucid, indeed compelling explanation of why Sheriff Dart's letter to MasterCard did constitute a threat." *Id.* at 236. That opinion analyzed communications amongst officers after the letter was sent as additional evidence of coercion. As here, where Deputy Whitlow and Lt. Hess discussed Whitlow's conversation with Plaintiff as a demand that Plaintiff "stop what he's doing" or face the threat of arrest, the court found post-letter statements that the sheriff's office was taking credit for "compelling" the credit card companies by issuing "demands" as evidence of official government coercion:

> Dart's letter to the credit card companies could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action against the companies if they declined his "request" to stop providing a method to pay for advertising on Backpage.com. Dart did not directly threaten the companies with an investigation or prosecution, and he admits that his department had no authority to take any official action with respect to Visa and MasterCard. But by writing in his official capacity, requesting a "cease and desist," invoking the legal obligations of financial institutions to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, Dart could reasonably be seen as implying

15

that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly…..

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com.... And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." *Id.* at 236-37.

The court further found that it was "obvious" that the sheriff's letter caused the credit card companies to end their relationship with the internet company and thus restrict the internet company's speech:

For that was a letter from a government official containing legal threats and demands for quick action and insisting that an employee of the recipient be designated to answer phone calls or respond to other communications from the sheriff. It was within days of receiving the letter that the credit card companies broke with Backpage. The causality is obvious. *Id.* at 233.

Here, as in Backpage, it is "obvious" that multiple threats of arrest made by a law enforcement officer would chill the speech of any reasonable person and did, in fact, chill that of Plaintiff. Because of Deputy Whitlow's threats, Plaintiff was forced to discontinue warning other consumers of his negative experience with CL Fencing. He has not posted any further online reviews of CL Fencing, despite his desire to continue doing so.

that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly…..

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com.... And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." *Id.* at 236-37.

The court further found that it was "obvious" that the sheriff's letter caused the credit card companies to end their relationship with the internet company and thus restrict the internet company's speech:

For that was a letter from a government official containing legal threats and demands for quick action and insisting that an employee of the recipient be designated to answer phone calls or respond to other communications from the sheriff. It was within days of receiving the letter that the credit card companies broke with Backpage. The causality is obvious. *Id.* at 233.

Here, as in Backpage, it is "obvious" that multiple threats of arrest made by a law enforcement officer would chill the speech of any reasonable person and did, in fact, chill that of Plaintiff. Because of Deputy Whitlow's threats, Plaintiff was forced to discontinue warning other consumers of his negative experience with CL Fencing. He has not posted any further online reviews of CL Fencing, despite his desire to continue doing so.

that the companies would face some government sanction—specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly…..

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com.... And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." *Id.* at 236-37.

The court further found that it was "obvious" that the sheriff's letter caused the credit card companies to end their relationship with the internet company and thus restrict the internet company's speech:

For that was a letter from a government official containing legal threats and demands for quick action and insisting that an employee of the recipient be designated to answer phone calls or respond to other communications from the sheriff. It was within days of receiving the letter that the credit card companies broke with Backpage. The causality is obvious. *Id.* at 233.

Here, as in Backpage, it is "obvious" that multiple threats of arrest made by a law enforcement officer would chill the speech of any reasonable person and did, in fact, chill that of Plaintiff. Because of Deputy Whitlow's threats, Plaintiff was forced to discontinue warning other consumers of his negative experience with CL Fencing. He has not posted any further online reviews of CL Fencing, despite his desire to continue doing so.

Ultimately, Plaintiff finds himself in a situation analogous to those receiving notices in *Bantam Books* and its internet progeny. Deputy Whitlow clearly engaged in an unlawful prior restraint warranting a finding of liability for violation of Plaintiff's First Amendment rights. See *Bantam Books*, 372 U.S. at 638 n.8.

## II. QUALIFIED IMMUNITY DOES NOT PROTECT DEPUTY WHITLOW

The actions of Deputy Whitlow in repeatedly threatening Plaintiff with arrest should he continue posting negative consumer reviews online are violations of clearly established law set forth herein. The unbroken line of decisions from within this Circuit, the United States Supreme Court, and beyond show that informal threats of criminal sanction by a government official can constitute coercion to silence speech sufficient to compel a finding of unconstitutional prior restraint on speech.

## CONCLUSION

For all the above reasons, Plaintiff requests that this Court consider and enter the partial Summary Judgment outlined herein.

Respectfully submitted this 29th day of January, 2020.

| | |
|---|---|
| /s/ Gerald Weber<br>Gerald Weber<br>Georgia Bar No. 744878 | s/Jennifer Hickey<br>Jennifer Hickey<br>Georgia Bar No. 440019 |
| LAW OFFICES OF GERRY WEBER, LLC<br>Post Office Box 5391<br>Atlanta, GA 31107<br>404-522-0507<br>wgerryweber@gmail.com | LAW OFFICE OF JENNIFER HICKEY, LLC<br>375 Rockbridge Rd NW Ste 172-338<br>Lilburn, GA 30047<br>770-674-8252<br>jennifer@jenniferhickeylaw.com |